# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:                                    Case No. 12-43956

Shanta Corp. d/b/a St. Anne's             Chapter 11
Convalescent Center, *et. al.*,[1]         Jointly Administered

          Debtors.          Hon. Thomas J. Tucker

_____/

## ORDER CONFIRMING DEBTORS' PLAN OF REORGANIZATION AND GRANTING FINAL APPROVAL OF DEBTORS' DISCLOSURE STATEMENT

This case having come before the Bankruptcy Court on September 5, 2012 for a hearing on the confirmation of the Debtors' *Second Amended Combined Plan and Disclosure Statement* [Docket Nos. 192-202] (the "Plan"); Debtors seek entry of this order (the "Confirmation Order"); due and appropriate notice under the circumstances having been given; all creditors and interested parties have had an opportunity to be heard; the Bankruptcy Court having considered the Plan and the record in this Chapter 11 case to date; due and sufficient factual and legal cause appearing therefore; and the Bankruptcy Court otherwise being fully advised in the premises;

**THE COURT FINDS THAT**:

A.     The Bankruptcy Court has jurisdiction over the bankruptcy case of the Debtors (the "Bankruptcy Case") pursuant to 28 U.S.C. §§157 and 1334.  Venue before this Court is proper pursuant to 28 U.S.C. §§1408 and 1409.  The confirmation of the Plan is a core proceeding under 28 U.S.C. §157(b)(2).

---

[1]  The Debtors in these jointly administered cases are Shanta Corporation d/b/a St. Anne's Convalescent Center ("St. Anne's") (Bankr. Case No. 12-43956), Cadillac Nursing Home, Inc. d/b/a St. Francis Nursing Center ("St. Francis") (Bankr. Case No. 12-43957) and St. Jude Nursing Center, Inc. ("St. Jude") (Bankr. Case No. 12-43959).

B.     All capitalized terms not defined herein have the meanings ascribed to them in the Plan.

C.     On February 22, 2012, the Debtors filed their bankruptcy petitions commencing these Bankruptcy Cases.

D.     On July 12, 2012, the Court entered the *Order Conditionally Granting Preliminary Approval of Debtors' Disclosure Statement* ("Approval Order") [Docket No. 191].

E.     On July 16, 2012, the Debtors filed the Plan pursuant to the Approval Order.

F.     Debtor has timely transmitted Ballots to the holders of Impaired Claims in accordance with the Approval Order and Rule 3018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and copies of the Plan and the Approval Order have also been timely provided as required by the Approval Order to all claimants and interest holders or has provided adequate notice of the Plan, Disclosure Statement and the Approval Order.

G.     Debtor has provided adequate notice of the Plan, Disclosure Statement and the Approval Order.

H.     On August 24, 2012 a *Final Report on Tabulation of Votes Cast by the Creditors on the Debtor's Second Amended Combined Plan and Disclosure Statement filed on July 16, 2012* [DN 231] (the "Voting Report") was filed by the Debtors.  Pursuant to the Voting Report, for each of the three Debtors, all voting classes other than Class II (Green Mountain) and Class V (the IRS) voted to accept the Plan.  Green Mountain voted to reject the Plan, and the IRS did not vote.  Pursuant to the terms of this Order, Green Mountain and the IRS have agreed to accept the Plan.

I.     The following objections were filed to the Plan (the "Objections"), all of which have been resolved pursuant to the terms of this Order:

      a.        Wayne County Treasurer [DN 209]

      b.        State of Michigan, Department of Treasury [DN 212]

      c.        Internal Revenue Service (the "IRS") [DN 218]

      d.        Green Mountain Finance Fund, LLC [DN 226]

      e.        Official Committee of Unsecured Creditors [DN 229]

J.      Several other informal objections were received by the Debtors, all of which have been resolved pursuant to the terms of this Order.

K.      On September 5, 2012, the Court held a hearing to consider confirmation of the Plan (the "Confirmation Hearing").

L.      At the Confirmation Hearing, all parties with objections had an opportunity to be heard, and the Court has adduced that the Plan has satisfied all the conditions set forth in §1129(a) of the Bankruptcy Code.

M.      All of the Objections have been withdrawn, resolved, or overruled pursuant to this Order. No other objections to confirmation of the Plan or approval of the Disclosure Statement have been filed.

N.      The Plan complies with all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules including without limitation, §§1122 and 1123 of the Bankruptcy Code. Furthermore, the Plan satisfies all of the requirements of §1129(a) of the Bankruptcy Code and L.B.R. 3020-1 (E.D.M.), and the Court being fully advised in the premises;

**IT IS ORDERED THAT**:

1.      The Plan, including all of its terms, provisions and exhibits which are incorporated herein by reference, is confirmed, subject to the modifications set forth below. Where inconsistent, this Confirmation Order supersedes the Plan.

2.      All objections to confirmation of the Plan, which have not been withdrawn or resolved, are hereby expressly overruled.

3.      The Disclosure Statement is granted final approval under 11 U.S.C. §1125.

4.      The modifications contained in this Confirmation Order constitute modifications allowed pursuant to 11 U.S.C. §1127 and do not adversely change the treatment of any Claim or Interest under the Plan.  Accordingly, in accordance with Fed. R. Bankr. P. 3019, the Plan shall be deemed accepted by all Creditors and Interest holders who have previously accepted the Plan, and it is not necessary for the Plan to be re-noticed to Creditors.

5.      With respect to the objection to plan confirmation filed by the United States of America, on behalf of the Internal Revenue Service (the "IRS"), the following is hereby ordered, and resolves the objection.  Notwithstanding anything to the contrary in the Plan, the Debtors shall pay any IRS allowed secured and priority claims in equal quarterly cash payments in the full amount of such claim within five (5) years of the Petition Date at a 3% interest rate. Notwithstanding anything to the contrary in Section 2.3 of the Plan, the Debtors shall be required to follow all applicable procedural rules to challenge liabilities including with respect to allowance of courts to have jurisdiction with respect to such challenges.  Notwithstanding anything to the contrary in the Plan, the IRS shall retain its liens during the life of the Plan. Notwithstanding anything to the contrary in the Plan, to the extent that the Debtors dispute any portion of the claims of the IRS, during the pendency of any such disputes, the Debtors or Reorganized Debtors, as applicable, shall pay only the undisputed portion of such claims. Notwithstanding anything to the contrary in the Plan, the Debtors reserve the right to challenge any claims, including secured claims, pursuant to Article XI of the Plan.  Notwithstanding anything to the contrary in the Plan, upon failure of the Debtors or Reorganized Debtors, as

applicable, to make any payment due on any administrative, secured, priority, or general unsecured claim of the IRS which is not cured within 30 days of the mailing of a written notice of default by the IRS, as well as a failure to meet the timeframes for liquidating the assets, if any, the IRS may exercise all rights and remedies applicable under non-bankruptcy law for the collection of its entire claim and/or seek appropriate relief from this Court. To the extent that any portion of the IRS claims are allowed as unsecured claims, such claims shall be treated pursuant to Section 3.4.1(C) of the Plan.

6.     With respect to the objection to plan confirmation filed by the Wayne County Treasurer ("Treasurer"), the following is hereby ordered, and resolves the objection. The Treasurer has an allowed secured claim in the amount of $17,060.40 for the past due real property taxes for the 2010 and 2011 tax years on the property located at 6200 and 6230 Cadieux, Detroit, Michigan ("St. Anne's Property"). Shanta Corp. d/b/a St. Anne's Convalescent Center shall pay annual payments to the Treasurer in the amount of $4554.00 beginning on January 15, 2013 and continuing on January 15 of each year thereafter. The amount owed to the Treasurer shall accrue interest at the statutory rate of 12% per annum. The Treasurer shall retain its lien on the St. Anne's Property until all past due real property taxes are paid in full. The Treasurer has an allowed secured claim in the amount of $102,894.72 for the past due real property taxes for the 2010 and 2011 tax years on the property located at 1533 Cadillac, Detroit, Michigan ("St. Francis Property"). Cadillac Nursing Home, Inc. d/b/a St. Francis Nursing Center shall pay annual payments to the Treasurer in the amount of $27,466.08 beginning on January 15, 2013 and continuing on January 15 of each year thereafter. The amount owed to the Treasurer shall accrue interest at the statutory rate of 12% per annum. The Treasurer shall retain its lien on the St. Francis Property until all past due real property taxes are

paid in full.  The Treasurer has an allowed secured claim in the amount of $84,638.79 for the past due real property taxes for the 2010 and 2011 tax years on the property located at 34350 Ann Arbor Trail, Livonia, Michigan ("St. Jude Property").  St. Jude Nursing Center, Inc. shall pay annual payments to the Treasurer in the amount of $22,592.88 beginning on January 15, 2013 and continuing on January 15 of each year thereafter.  The amount owed to the Treasurer shall accrue interest at the statutory rate of 12% per annum.  The Treasurer shall retain its lien on the St. Jude Property until all past due real property taxes are paid in full.  Each Debtor shall pay the summer 2012 taxes on or before December 31, 2012.  All subsequent real property taxes due on the St. Anne's Property, St. Francis Property, and St. Jude Property shall be paid when they are due.  In the event of a default by any of the Debtors in its payment obligations on the real property taxes, which default is not cured within fifteen (15) days of the mailing by the Treasurer of a written notice of default to Debtor and Debtor's counsel, the Treasurer may exercise all rights and remedies available under nonbankruptcy law for the collection of its entire claim without seeking further relief from the Court.

7.     Notwithstanding anything to the contrary in the Plan, the rights and remedies of Flatiron Capital shall not be affected or impacted in any way by the Plan or this Order.  In the event of a default by the Debtors or Reorganized Debtors of any payment obligation to Flatiron Capital, Flatiron Capital may take any actions allowable under its loan documents and in accordance with state and Federal law to enforce its rights under such loan documents, notwithstanding any automatic stay or plan injunction that would otherwise be applicable, relief from any such stay or injunction to be deemed granted to Flatiron Capital upon the occurrence of a default and the lapse of any applicable cure period pursuant to the applicable loan documents.

8.      With respect to the objection to plan confirmation filed by the State of Michigan, Department of Treasury ("Michigan Treasury"), the following is hereby ordered, notwithstanding anything to the contrary in the Plan, and resolves the objection.  Michigan Treasury will be paid on a quarterly basis at a 4.25% interest rate and otherwise consistent with the Plan, with Plan payments anticipated to begin no later than December 1, 2012.  Upon failure of the Debtors or Reorganized Debtors, as applicable, to make any payment due on any administrative, secured, priority, or general unsecured claim of Michigan Treasury which is not cured within 30 days of the mailing of a written notice of default by Michigan Treasury, as well as a failure to meet the timeframes for liquidating the assets, if any, Michigan Treasury may exercise all rights and remedies applicable under non-bankruptcy law for the collection of its entire claim and/or seek appropriate relief from this Court.  Michigan Treasury's rights to setoff or recoupment under applicable non-bankruptcy law shall not be impaired by the Plan or this Order except as otherwise set forth in this paragraph.

9.      Notwithstanding anything to the contrary in the Plan, the Disclosure Statement, any orders entered by the Court in this case, the Bankruptcy Code, or other applicable non-bankruptcy law, with respect to priority creditor Michigan Department of Community Health ("DCH") and the State of Michigan Department of Licensing and Regulatory Affairs, Unemployment Insurance Agency ("UIA"):  (a) DCH will be paid on a quarterly basis at a 5% interest rate and otherwise consistent with the Plan; (b) UIA will be paid on a quarterly basis at an interest rate of one (1%) percent per month pursuant to M.C.L. 421.15 and 11 U.S.C. 511; (c) upon any default of any Reorganized Debtor, and failure to cure such default within 20 days of receiving notice of such default from the DCH or UIA,  DCH and/or UIA, as the case may be, may take any actions against such Reorganized Debtor allowable under applicable non-

bankruptcy law, rules, and regulations, to enforce its rights against such Reorganized Debtor under such laws, rules, and regulations, and notwithstanding any automatic stay or plan injunction that would otherwise be applicable, relief from any such stay or injunction shall be deemed granted to DCH and/or UIA, as the case may be, as to such Reorganized Debtor upon the occurrence of a default and the failure to cure such default within 20 days, ***such rights including, but not limited to***, DCH's right to recoup any Quality Assessment & Assurance ("QAA") arrearage that any of the Reorganized Debtors currently owe or may incur from any outgoing Medicaid reimbursement payments otherwise owing to such respective Reorganized Debtor in the event of a default by such Reorganized Debtor that is not cured within twenty (20) days from such Reorganized Debtor receiving notice of such default from DCH; and (d) DCH's and UIA's rights to setoff or recoupment under applicable non-bankruptcy law shall not be impaired by the Plan or this Order except as otherwise set forth in this paragraph.

10.    Notwithstanding anything to the contrary in the Plan, including Section 10.1 of the Plan, the following executory contracts of the Debtors shall be and hereby are assumed by the Debtors and assigned to the respective Reorganized Debtors, and any applicable cure amounts have been agreed upon by the applicable contract counter-parties as set forth in the Debtors' Plan projections, as revised: all executory contracts among the Debtors and Rehabilitation Masters; and all executory contracts among the Debtors and VPH Pharmacy. Service of this Order shall be deemed notice of the rejection of any other executory contract pursuant to Sections 10.1 and 10.5 of the Plan.

11.    Notwithstanding anything to the contrary in the Plan, any exculpations granted in the Plan at Section 5.6 shall not apply to any of the Debtors' or the Committee's counsel

employed under Section 327 of the Bankruptcy Code or as "ordinary course professionals" pursuant to Bankruptcy Court order.

        12.     In settlement of the objections of the Official Committee of Unsecured Creditors to confirmation of the Plan, the Plan shall be modified as follows:

        A.     The following section shall be added as Section 3.4.1(D) to the Plan:

        1.     On the Effective Date, each of the Debtors shall issue a Note payable (the "<u>Class IV Notes</u>") to Holders of Allowed Class IV Claims (excluding claims payable under Section 3.4.1(A) of the Plan) that will reflect the percentage amounts and payment terms identified in Sections 3.4.1(B) and 3.4.1(C) of the Plan. Upon the Allowance, Disallowance or Modification of all Class IV Claims pursuant to the Plan, each Debtor shall file with the Court an amended schedule of payees and claim amounts as determined in accordance with the claim dispute resolution procedures set forth in Section 11.3 of the Plan, and such amended schedule shall be deemed to modify the amount of such claims for distribution purposes under the Class IV Notes.

        2.     On or before the Effective Date, the Committee shall file with the Bankruptcy Court the name and address of a Plan Monitor (the "<u>Plan Monitor Designation</u>"), who shall have the following functions:

        a.     The Plan Monitor shall be authorized to exercise all rights and remedies of the payees of the Class IV Notes upon the occurrence of any default in the terms the Class IV Notes, including, but not limited to, enforcing the payment terms of the Class IV Notes and bringing any actions against any collateral with respect to the Class IV Notes or any other terms and provisions of the Class IV Notes.

        b.     The Reorganized Debtors shall provide to the Plan Monitor, within five days of any payments on the Class IV Notes, a certified statement that all payments have been made to the payees of the Class IV Notes pursuant to the Plan.

        c.     The Plan Monitor shall be paid at the hourly rate disclosed in the Plan Monitor Designation to perform the monitoring functions described herein, provided that the aggregate fees and costs of the Plan Monitor for such monitoring functions

shall not exceed $2,000 annually. The Plan Monitor shall provide an invoice to the Reorganized Debtors for these monitoring fees and the fees shall be promptly paid by the Reorganized Debtors. In the event that the Reorganized Debtors believe, in their reasonable discretion, that the invoiced fees are not reasonable in light of the duties of the Plan Monitor described herein, the Reorganized Debtors may submit a written notice to the Plan Monitor raising such concerns. In the event that the Plan Monitor and the Reorganized Debtors cannot resolve the dispute in a manner acceptable to both parties, the Plan Monitor or the Reorganized Debtors may take whatever actions are required to present the matter to the Bankruptcy Court or such other court of competent jurisdiction in the State of Michigan for adjudication of such dispute.

d.      On the Effective Date, the Debtors shall deposit into escrow in an interest-bearing account the amount of $10,000 (the "Escrow") pursuant to an escrow agreement with an escrow agent selected by the Debtors and the Committee (the "Escrow Agent") as escrow agent that will be executed by the Escrow Agent, the Plan Monitor and the Reorganized Debtors. Upon the occurrence of an event of default upon any of the Class IV Notes, the Plan Monitor shall be entitled to the transfer of the Escrow Amount, which may be used by the Plan Monitor to fund the reasonably necessary costs, fees and expenses associated with the Plan Monitor's functions as described herein, including, but not limited to, the Plan Monitor's fees and legal fees incurred in instituting and prosecuting litigation against the Reorganized Debtors. In the event the Plan Monitor expends less than the amount of the Escrow, the balance of the Escrow shall be held by the Plan Monitor and may be expended in accordance with the provisions of this section in the event of the occurrence of an additional event of default under any of the Class IV Notes. Upon payment in full of all obligations of the Reorganized Debtors under the Class IV Notes, any remaining amount of the Escrow shall be returned to the Reorganized Debtors.

e.      Upon payment in full of all obligations of the Reorganized Debtors under the Class IV Notes, the Plan Monitor's functions shall terminate and the Plan Monitor shall have no further rights or responsibilities under the Plan.

f. The Plan Monitor shall, upon the occurrence of any event of default on any of the Class IV Notes, have the following powers and authority, and the automatic stay shall be deemed waived upon the occurrence of an event of default without further order:

    i. Enforcing the rights of payment of the payees of the Class IV Notes by any method deemed appropriate including, without limitation, judicial proceedings or pursuant to any applicable bankruptcy, insolvency, or similar law and general principles of equity;

    ii. Exercising any rights of the payees of the Class IV Notes in any collateral securing the Class IV Notes; and

    iii. Compromising, adjusting, arbitrating, suing on or defending, abandoning, or otherwise dealing with and settling, any such event of default.

g. The Plan Monitor shall be permitted to resign upon (30) thirty days written notice to the Reorganized Debtors. In the event the Plan Monitor resigns, the Reorganized Debtors shall either (a) petition the Court for appointment of a replacement Plan Monitor or (b) notify the Payees of the Class IV Notes that the Plan Monitor has resigned an offer the Payees a period of (30) thirty days to provide a written vote to the Reorganized Debtors for a substitute Plan Monitor. Any candidate that (a) receives a majority of the votes based upon the amount of claims voting for the candidate against the total amount of claims that cast votes and (b) agrees to be bound to the terms of this Order or any documents executed by the Plan Monitor under the Plan, shall be appointed as the substitute Plan Monitor. In alternative, any Holder of an Allowed Class IV Claim may petition the Court for appointment of a replacement Plan Monitor.

h. Provided that there is no continuing event of default on any of the Class IV Notes, the Plan Monitor shall release the Liens upon the request of the Reorganized Debtors in furtherance of any ordinary course of business sales of any assets of the Reorganized Debtors and for all sales agreed to by the Plan Monitor or approved by Court order after notice and opportunity for the Plan Monitor to object in the

event that an objection is necessary to protect the rights of the Class IV Claim Holders under the Class IV Notes, in the Plan Monitor's reasonable discretion. Notwithstanding anything to the contrary in the Plan or this Order, the Reorganized Debtors may petition the Court, if necessary, to re-open any of the Bankruptcy Cases, and may move the Court to approve the sale of any of the Reorganized Debtors' assets under Section 363 of the Bankruptcy Code, subject to the Plan Monitor's right to object in the event that an objection is necessary to protect the rights of the Class IV Claim Holders, in the Plan Monitor's reasonable discretion.

i.    The Plan Monitor shall be entitled to payment of his reasonable compensation as well as the costs and fees incurred by his legal counsel and other advisors from (i) the Escrow, (ii) from the Reorganized Debtors pursuant to the fee shifting provisions in the Class IV Notes and, (iii) if these sources of repayment are not available, from any recoveries on account of the Class IV Notes. Notwithstanding anything herein to the contrary, the Plan Monitor shall not be required to advance any of his or her own funds or incur any personal expenses that are not reimbursable under this Order in the performance of any duties permissible under this Order or under any document executed in connection with the Plan.

j.    After payment of the Plan Monitor's expenses as set forth herein, any remaining funds collected by the Plan Monitor hereunder shall be distributed to the payees of the Class IV Notes on a pro rata basis.

k.    Neither the Plan Monitor nor his employees, officers, directors and agents shall be personally liable for any action or inaction in connection with the performance of his duties under the Plan. Anything herein to the contrary notwithstanding, in exercising the rights and duties set forth herein, the Plan Monitor shall use his best judgment, and shall not incur any responsibility or liability by reason of any negligence, error of law or of any matter or thing done or suffered or omitted to be done under the Plan, except for willful default, fraud or intentional misconduct.

3.    The Plan Monitor shall be a disinterested person as that term is defined in Section 101(14) of the Bankruptcy Code.

4. The Class IV Notes shall be secured by a perfected security interest in all assets of the Reorganized Debtor that is the obligor of such Class IV Notes, subject to valid and enforceable pre-existing liens and security interests (the "Lien(s)"). The Plan Monitor shall act as collateral agent for the Class IV Notes and shall have all of the rights set forth in the Plan with respect to the Lien.

5. As additional security for the Class IV Notes on the Effective Date, Bradley Mali, the ultimate owner of the Debtors, shall execute a Pledge of his equity interest in Fusion Holdings, LLC, as security for the Class IV Notes, which pledge shall attach to such equity interests subject only to valid and enforceable pre-existing liens of pledges (the "Pledge"). The Plan Monitor shall act as collateral agent for the Class IV Notes and shall have all of the rights set forth in the Plan with respect to the Pledge.

6. The executed Class IV Notes and all other documents necessary to implement this modification to the Plan shall be approved by the Debtors and the Committee or by further Order of this Court. The final version of these documents shall be executed as of the Effective Date and filed with the Court with the Debtors' notice of the occurrence of the Effective Date.

B. Section 11.1, "TIMING OF OBJECTIONS" in the Plan shall be stricken

and the following shall be added in place of this section in the Plan:

Except as otherwise provided in the Confirmation Order with respect to any Claim, the Debtors or Reorganized Debtors may object to the allowance and priority of any Claim, or the extent, validity and enforcement of any security interest, whether listed on the Schedules filed by Debtor or filed by any creditor, on or before the later of (a) ninety (90) days from the date of filing of any proof of claim or (b) ninety (90) days after the Effective Date. The Reorganized Debtors may mutually agree in writing with any creditors to extend this time and may petition the Bankruptcy Court for an extension of this time by filing an appropriate motion. The service of the motion through the Court's electronic court filing system shall be sufficient notice of any such request, provided however that the Plan Monitor shall also be served with the motion and shall have standing to object to the motion if an objection is necessary to protect the rights of the Class IV Claim Holders, in the Plan Monitor's reasonable discretion. To the extent the Debtors or Reorganized Debtors file any objection to any claim in Class IV of the Plan, the Debtors or Reorganized Debtors shall

diligently and promptly pursue disposition of the claim objection by the Bankruptcy Court, by settlement with the claimant or otherwise, pursuant to the Plan. Any claim not subject to a timely objection as provided for herein shall be deemed an Allowed Claim pursuant to the Plan.

13.     The following language shall be deemed to be a part of the Plan:

A.      **The Green Mountain Claim is Allowed.** The Green Mountain Claim [Proof of Claim No. 18-1] in the principal amount of $2,755,081.26 plus all fees, costs, and expenses allowed by contract is undisputed and allowed in full. Green Mountain is deemed an over secured creditor. Unless specifically modified in the Plan or this Confirmation Order, any and all loan documents and related documents and agreements by and between (or in which Green Mountain is an assignee or successor) Green Mountain and Debtors shall remain in full force and effect ("Loan Documents"), except that the Loan Documents shall not create additional liabilities beyond or in excess of the liabilities set forth in the Plan or this Confirmation Order unless the Debtor is in default of its obligations to Green Mountain under the Plan or this Confirmation Order and such default continues beyond the notice and cure period as set forth below or in the event there is a material adverse impact on the Green Mountain Collateral or the Debtors' projections as incorporated in the Chapter 11 Plan. By way of example, the creation of liens under the Plan and this Order shall not be deemed to have created a material adverse impact. As of the date of this Order, the Debtors are deemed not to be in default under the terms of the Loan Documents.

B.  **Plan Treatment.**  The Debtors shall remit payment to Green Mountain on account of its claim (inclusive of interest, fees, and costs thereon) commencing on October 1, 2012 as follows:

a.  The Green Mountain Indebtedness shall be paid in full with sixty (60) equal monthly payments (subject to the pre-payments as discussed in paragraph 14(c)) in the amount of TWENTY-ONE THOUSAND ONE HUNDRED NINETY-ONE AND 74/100 ($21,191.74) DOLLARS, with any outstanding amount due to be paid in full on the first day of the sixtieth month;

b.  The sixty (60) equal monthly payments shall be calculated based on a 360 month amortization with interest accruing from the Effective Date at eight and one-half (8½%) percent per annum;

c.  Green Mountain shall retain its Liens on all collateral securing the Green Mountain Indebtedness ("Green Mountain Collateral");

d.  Debtors shall make a payment in the amount of TWENTY-FIVE THOUSAND ($25,000.00) DOLLARS to Green Mountain on the earlier of ninety (90) days from the Effective Date and the date of the Sale of the Bed Licenses as a penalty payment due and owing to Green Mountain;

e.  Debtors shall make a payment in the amount of FIFTY-FOUR THOUSAND NINETY-TWO & 50/100 ($54,092.50) DOLLARS to Green Mountain on the earlier of ninety (90) days from the

Effective Date and the date of the Sale of the Bed Licenses as a payment for attorney fees and costs owed to Green Mountain;

f.    Debtors shall be responsible to Green Mountain for an Exit Fee (the "<u>Exit Fee</u>") in the amount of seven and one half (7½%) percent of the principal balance of the loan at such time the loan is paid in full.

    1.    By way of example, if the final payment of the loan is made with a principal balance of ONE MILLION ($1,000,000.00) DOLLARS, Green Mountain shall be entitled to an Exit Fee in the amount of SEVENTY FIVE THOUSAND ($75,000.00) DOLLARS.

## C.    Default.

a.    <u>**Event of Default.**</u>  Failure of the Debtors or any insiders or guarantors to the Loan Documents to perform any of their material obligations set forth in this Order Confirming the Plan, the Plan, any agreements or stipulations related to the Plan, any agreements, stipulations or orders entered in the Chapter 11 proceedings, or the Loan Documents, shall be deemed an "Event of Default." For the avoidance of doubt, the Debtors' obligations under the Final Order Authorizing the Debtors to Use Cash Collateral and Granting Adequate Protection, and any amendments, shall not survive the Effective Date but shall be replaced in their entirety by the Debtors' obligations under the Plan and this Order Confirming the

Plan; however, Debtors shall be responsible for the September 2012 payments to Green Mountain as set forth in the Final Order Authorizing the Debtors to Use Cash Collateral and Granting Adequate Protection. The September 2012 payments shall be made immediately. The payments made by the Debtors to Green Mountain during the Chapter 11 case as adequate protection satisfies all the Debtors' post-petition interest payment obligations (except to the extent that the Debtors may be in arrears on post-petition payments).

b. **<u>Defaults on Third Party Obligations.</u>** Any default by the Debtor of a material obligation to any creditor other than Green Mountain shall be an Event of Default hereunder, except that should a default by the Debtors of a material obligation to the third party creditor be cured pursuant to the terms of such agreement between the Debtors and the third party creditor (provided the terms of such agreement between the third party creditor and the Debtors provides for an opportunity to cure) such default shall not be an Event of Default hereunder. Moreover, any default to a third party creditor shall not be an Event of Default if such default: (i) has not been declared by the third party creditor; (ii) has been waived in writing by such third party creditor; or (iii) is subject to a written forbearance agreement on which such default has been declared, but such third party creditor has agreed to forbear from enforcing its rights

against Debtors until such time that the third party creditor exercises its rights against the Debtors with respect to the default. It is specifically understood that any default alleged by the Plan Monitor on behalf of any creditor(s) shall be considered an Event of Default hereunder.

c.     **Non-Curable Defaults.**  In addition, an Event of Default shall also occur under this Order upon the occurrence of any of the following events, each of which shall be deemed non-curable unless consented to or waived by Green Mountain in writing to the Debtors ("<u>Non-Curable Defaults</u>"): (i) the conversion or dismissal of any one of the Debtors' Chapter 11 cases; (ii) the Debtors confirm a Chapter 11 Plan of Liquidation; (iii) a Chapter 11 Trustee is appointed to operate any one of the Debtors; (iv) any cessation of the Debtors' business, for any reason, lasting more than seven (7) days.

D.     **Remedies.**

a.     **Notice.**  Upon the occurrence of an Event of Default (other than a Non-Curable Default) Green Mountain may serve by email, mail, or facsimile, a written Notice of Default ("<u>Notice</u>") upon Debtors' counsel and the Debtor (by certified U.S. mail, return receipt requested or by a reputable overnight courier system that tracks deliveries) at the following addresses:

Shanta Corporation dba St. Anne's Convalescent Center

6232 Cadieux Road
Detroit, MI 48224

Cadillac Nursing Home, Inc. dba St. Francis Nursing Center
1533 Cadillac Boulevard
Detroit, MI 48234-1400

St. Jude Nursing Center, Inc.
34350 Ann Arbor Trail
Livonia, MI 48150

Mission Point Management Services, LLC
c/o Roger Mali
721 Elmwood
Troy, MI 48083

with a copy to

Michael E. Baum
Schafer and Weiner, PLLC
40950 Woodward Ave., Suite 100
Bloomfield Hills, MI 48304
Fax: (248) 282-1933
e-Mail: mbaum@schaferandweiner.com

and

The Plan Monitor, at the address disclosed in the Plan Monitor
Designation

**b.**     **<u>Right to Cure.</u>**  Debtors shall have ten (10) days from the date the
Notice is sent by Green Mountain to the Debtors to cure the Events
of Default related the Debtors' failure to remit timely payments
when due (the "<u>Cure Period</u>").   Notwithstanding the foregoing,
Debtors are not entitled to Notice or an opportunity to cure any
Non-Curable Default.   Upon the occurrence of a Non-Curable
Default, Green Mountain may immediately exercise all of its rights

and remedies set forth in the Chapter 11 Plan, this Confirmation Order, and the Loan Documents without limitation.

c. **Administrative & Default Fees.**  At the time an Event of Default is cured, Debtors shall also pay Green Mountain FIVE THOUSAND ($5,000.00) DOLLARS as an administrative fee in addition to all other amounts due.

d. **Right to Take Possession of the Green Mountain Collateral.** Should an Event of Default occur and not be cured as provided herein or where such Event of Default is a Non-Curable Default, Green Mountain shall have the right to take immediate possession of the Green Mountain Collateral.  Debtors shall grant Green Mountain access to its buildings, facilities, and assets to the extent necessary to allow Green Mountain and any of its agents to remove the Green Mountain Collateral and/or dispose of the Green Mountain Collateral as provided in the Loan Documents and/or under Article 9 of the Uniform Commercial Code.

e. **Ex-Parte Relief.**  In the event the Debtors refuse to provide Green Mountain with access to its facilities and assets to allow Green Mountain to remove the Green Mountain Collateral, Green Mountain shall be entitled to submit and Debtors agree that the Bankruptcy Court (or any other Court of competent jurisdiction and venue as selected by Green Mountain) may enter an *ex parte* order: (i) restraining the Debtors, their officers, agents, employees,

and all other persons acting in concert with them from directly or indirectly using, removing, disposing, pledging, transferring, assigning, or encumbering the Green Mountain Collateral; (ii) authorizing and directing the United States Marshal or Sheriff or other duly authorized official to seize, replevin, and/or recover possession of the Green Mountain Collateral for Green Mountain's benefit or (iii) exercise any other right or pursue any other remedy available by the Loan Documents or applicable state law.

f.     **<u>Debtors May Seek Relief from the Bankruptcy Court.</u>**   The Debtors' sole sources of relief from the rights and remedies granted to Green Mountain herein is through an ex parte motion before the Bankruptcy Court (or any other Court of competent jurisdiction and venue as selected by Green Mountain) by *Order to Show Cause Why an Event of Default has not Occurred and Why Ex Parte Relief Should Not Be Granted*, with such motion being heard no later than fourteen (14) days from the date the *Order to Show Cause* is signed by the Bankruptcy Court (or any other Court of competent jurisdiction and venue as selected by Green Mountain). The Debtors must file the Order to Show Cause within the cure period (if applicable). Regardless of the outcome of the Debtors' Motion by Order to Show Cause, Debtors shall be responsible for paying Green Mountain's reasonable attorney fees,

costs, and expenses in seeking relief and defending itself against any Order to Show Cause or any other motion made by Debtors.

g. **Relief from the Automatic Stay.**  If the Debtors fail to comply with any of the terms set forth in this Order, to the extend required, the automatic stay imposed under 11 U.S.C. § 362 shall be deemed to be modified to allow Green Mountain to exercise all of its rights and remedies provided to Green Mountain under the Chapter 11 Plan, the Confirmation Order, and the Loan Documents.  This provision is self-effectuating and is intended to allow Green Mountain to pursue all of its rights and remedies without the need to file a motion for relief from the automatic stay.

E. **Preservation of Green Mountain's Rights and Remedies.**  All rights and remedies provided to Green Mountain in this Order are cumulative and not exhaustive.  The failure of Green Mountain to provide Notice as set forth herein or to otherwise enforce any of its rights and remedies hereunder shall not be deemed a waiver of any defaults by the Debtors or a waiver of Green Mountain's rights and remedies as set forth in the Chapter 11 Plan, the Confirmation Order, and the Loan Documents.

F. **Value of Assets Shall Not be Impaired.**  From the date of this Order forward, Debtors shall not take any actions that will impair the value of the Green Mountain Collateral or Green Mountain's security interest and liens in the Green Mountain Collateral until the Green Mountain Claim is paid in full in the manner as described herein. In particular, though

without limitation, Debtors shall not sell, transfer, assign, encumber, lease, rent, or allow any other parties to operate the Green Mountain Collateral without Green Mountain's express written consent.

G.     **Waiver and Release of Green Mountain.**  Debtors and their estates forever waive and release Green Mountain and any predecessors, officers, directors, employees, agents, attorneys, parents, subsidiaries and affiliates (the "<u>Green Mountain Parties</u>") from any claims, causes of action, or other rights the Debtors and their estates may have and/or hold against Green Mountain and the Green Mountain Parties on or before the Effective Date, including, but not limited to, any avoidance actions that could be brought by the Debtors or any other parties acting on behalf of the estates under Chapter 5 of the Bankruptcy Code.

H.     **No Waiver of Debtors, Co-Obligors, or Guarantors.**  Green Mountain's consent to this Confirmation Order does not constitute a waiver of nor does it prejudice in any way Green Mountain's right to pursue any co-obligors or guarantors of the Debtors' obligations to Green Mountain in the event that an Event of Default occurs and is not cured within any applicable Cure Period.

I.     **Payments to Green Mountain.**  Debtors shall remit payments to Green Mountain in a form and manner acceptable to Green Mountain.  Green Mountain shall provide the Debtors with written instructions advising the Debtors as to the manner in which payments should be made to Green Mountain.   Green Mountain may change or modify the payment

instructions at any time and notify the Debtors of such changes or modifications in writing.

**J.**     <u>**No Commitment to Loan.**</u>     Nothing in this Order shall constitute any commitment by Green Mountain to make any additional loans or extend any further credit or other financial accommodations to or for the benefit of the Debtors, their co-obligors, and guarantors.

**K.**     <u>**Successors and Assigns.**</u>     This Order shall be binding upon and inure to the benefit of the respective successors and/or assigns of Green Mountain and the Debtors.  Green Mountain may freely transfer, pledge, sell, and/or assign some or all of its rights, interests, and benefits provided under the Chapter 11 Plan, Confirmation Order, and Loan Documents.  In addition, the provisions of this Order and any actions taken pursuant hereto shall survive entry of any Order: (i) dismissing this bankruptcy case; (ii) converting the Debtors' Chapter 11 case to Chapter 7; (iii) appointing a Chapter 11 Trustee; and (iv) any subsequent bankruptcy case filed subsequent to the entry of a final decree in this bankruptcy proceeding, with the terms and provisions set forth in this Order, including the priorities, payments, liens, and security interests granted pursuant to this Order, continuing as obligations of the Debtor should any event described herein occur.  Notwithstanding the forgoing, nothing in this Order shall impair any rights under 11 U.S.C. § 726(b).

**L.**     <u>**Conflict in Documentation.**</u>     Except as otherwise provided herein, the terms and conditions set forth in the Loan Documents and all documents

related thereto shall govern the relationship between the Debtors and Green Mountain.

14.     Notwithstanding anything to the contrary in the Plan, Debtor St. Anne's is hereby authorized, but not required, to sell, pursuant to 11 U.S.C. § 363, property consisting of 27 bed licenses (the "Bed Licenses") for a purchase price of no less than $16,500.00 per Bed License (the "Sale").  The Debtor has received one *bona fide* offer to purchase the Bed Licenses in the amount set forth above from a competitor of the Debtors, who is not an insider or affiliate of any of the Debtors, with such offer being subject to acceptable documentation that provides that the Bed Licenses are being sold on an "as is, where is" basis and without any representation or warranty of any kind other than (a) customary representations and warranties with respect to the Debtors' authority to sell the Bed Licenses and (b) that the Bed Licenses will be sold free and clear of all liens, claims, and encumbrances.  In the event that said offeror is not able to close on the Sale, the Debtor may attempt to locate another buyer upon terms at least as favorable as the Sale terms above, but in no event may the buyer of the Bed Licenses be an insider or affiliate of any of the Debtors.  Green Mountain holds a first-priority security interest in the proceeds of the Sale, and consents to the Sale under the terms set forth herein.  In the event of a Sale, the net proceeds of the Sale (net of any costs associated with the actual closing of the sale itself, not including any legal fees incurred by either party, but including any administrative or other required fees, taxes, and other similar payments) shall be distributed as follows (to the extent that the actual proceeds of the Sale are more or less than the total of the payments below, such payments will be adjusted pro rata):

a.      Administrative expense priority claims (for 2012 Real and Personal Property Taxes):

       i.      St. Anne's - $65,914.00

       ii.     St. Francis - $38,189.00

       iii.    St. Jude - $12,143.00

b.     Administrative expense priority claims (for a portion of the Allowed Claims of professional fee claimants):

       i.      Debtors' counsel - $70,000.00

       ii.     Creditor's Committee counsel - $10,000.00

       iii.    Debtors' counsel (Medicaid Reimbursement Counsel) - $10,000

c.     Green Mountain shall receive TWO HUNDRED TWENTY-ONE THOUSAND THREE HUNDRED SIXTY-NINE ($221,369.00) DOLLARS of any sale proceeds. Green Mountain may use such funds to bring the loan current, allocating the payment to: (i) penalties (limited to $25,000); (ii) attorney fees and costs (to the extent of approximately $54,092.50 plus any reasonable additional attorney's fees and costs accruing prior to the closing of any such sale); and (iii) past-due postpetition interest payments, if any. After the payment of all such amounts, Green Mountain shall apply such proceeds to fund the first two (2) months of mortgage payments under the terms of the confirmed Plan, with any remaining funds to be applied to principal.

d.     United States Trustee Fees:

       i.      St. Anne's - $6,505.00

       ii.     St. Francis - $6,505.00

       iii.    St. Jude - $4,875.00

15.    No just reason exists for delay in the implementation of this Confirmation Order. The Bankruptcy Court hereby directs entry of the judgment set forth herein. This Confirmation Order is a final and appealable order pursuant to Federal Rules of Bankruptcy Procedure 7054(a) and 9014 and Federal Rule of Civil Procedure 54(b). This Bankruptcy Court shall reserve and retain jurisdiction to enforce the terms of the Confirmation Order or rule upon any disputes arising from this Confirmation Order.

.

**Signed on September 07, 2012**

                                  /s/ **Thomas J. Tucker**
                                  **Thomas J. Tucker**
                                  **United States Bankruptcy Judge**